IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEFFREY THOMAS MCMEEKIN,            )
                                     )
        Plaintiff,                   )
                                     )
    -vs-                             )    Civil Action No. 16-1831
                                     )
NANCY A. BERRYHILL,[1]               )
COMMISSIONER OF SOCIAL SECURITY,     )
                                     )
        Defendant.                   )

AMBROSE, Senior District Judge.

## OPINION AND ORDER

### Background

Plaintiff Jeffrey Thomas McMeekin ("McMeekin") brings this action pursuant to 42 U.S.C. § 1383(c)(3) for review of the ALJ's decision denying his claim for disability insurance benefits and for a period of disability. He alleges a disability beginning on October 12, 2011 based upon both physical and mental impairments. (R. 16) Following a hearing before an ALJ, during which both McMeekin and a vocational expert ("VE") testified, the ALJ again denied his claims. The ALJ concluded that, although he could not return to his prior work, McMeekin had the residual functional capacity ("RFC") to make a successful adjustment to other work that exists in significant numbers in the national economy. (R. 25) McMeekin appealed. Pending are Cross Motions for Summary Judgment. *See* ECF Docket Nos. [11] and [13]. After careful consideration, the case is remanded for further consideration.

---

[1] Nancy A. Berryhill became acting Commissioner of Social Security on January 23, 2017, replacing Carolyn W. Colvin.

1

**Legal Analysis**

1. Standard of Review

The standard of review in social security cases is whether substantial evidence exists in the record to support the Commissioner's decision. *Allen v. Bowen,* 881 F.2d 37, 39 (3d Cir. 1989). Substantial evidence has been defined as more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate. *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir. 1995), *quoting Richardson v. Perales,* 402 U.S. 389, 401 (1971). Determining whether substantial evidence exists is "not merely a quantitative exercise." *Gilliland v. Heckler,* 786 F.2d 178, 183 (3d Cir. 1986) (*citing Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir. 1983)). "A single piece of evidence will not satisfy the substantiality test if the secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians)." *Id.* The Commissioner's findings of fact, if supported by substantial evidence, are conclusive. 42 U.S.C. §405(g); *Dobrowolsky v. Califano,* 606 F.2d 403, 406 (3d Cir. 1979). A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Palmer v. Apfel,* 995 F.Supp. 549, 552 (E.D. Pa. 1998). Where the ALJ's findings of fact are supported by substantial evidence, a court is bound by those findings, even if the court would have decided the factual inquiry differently. *Hartranft v. Apfel,* 181 F.3d 358, 360 (3d Cir. 1999). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See,* 5 U.S.C. §706.

To be eligible for social security benefits, the claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Brewster v. Heckler, 786 F.2d 581, 583 (3d Cir. 1986). The Commissioner has provided the ALJ with a five-step sequential analysis to use when evaluating the disabled status of each claimant. 20 C.F.R. § 404.1520(a). The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if the claimant has a severe impairment, whether it meets or equals the criteria listed in 20 C.F.R., pt. 404, subpt. P, appx. 1; (4) if the impairment does not satisfy one of the impairment listings, whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy, in light of his age, education, work experience, and residual functional capacity. 20 C.F.R. § 404.1520. The claimant carries the initial burden of demonstrating by medical evidence that he is unable to return to his previous employment (steps 1-4). Dobrowolsky, 606 F.2d at 406. Once the claimant meets this burden, the burden of proof shifts to the Commissioner to show that the claimant can engage in alternative substantial gainful activity (step 5). Id. A district court, after reviewing the entire record, may affirm, modify, or reverse the decision with or without remand to the Commissioner for rehearing. Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984).

2. ALJ's Assessment

Here, the ALJ determined that McMeekin met the insured status requirements for disability insurance benefits through December 31, 2011. (R. 18) At step one, the ALJ found that although McMeekin did engage in work after the alleged disability onset date, the work did not rise to the level of substantial gainful activity. (R. 18) At step two, the ALJ concluded that McMeekin has the following severe impairments: left shoulder degenerative joint disease; bursitis and impingement; neurocognitive disorder-mild; and a disorder of written expression and a reading disorder. (R. 19)

At step three, the ALJ found that none of McMeekin's impairments met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpt, P, Appendix 1. Specifically, the ALJ determined that McMeekin's "left shoulder degenerative joint disease, bursitis and impingement did not meet or medically equal Listing 1.02B (Major Dysfunction of a Joint) as it only involved his upper left extremity." (R. 19) Further, the ALJ found that McMeekin's mental impairments did not meet or medically equal Listing 12.02. (R. 19) With respect to the "paragraph B" criteria, the ALJ found that McMeekin had no restrictions with respect to activities of daily living and no difficulties with respect to social functioning. (R. 19)[2] With respect to issues in maintaining concentration, persistence, or pace, the ALJ found that McMeekin has "moderate difficulties."[3] The ALJ also determined that McMeekin did not exhibit any episodes of decompensation for an extended duration. (R. 20) Similarly, the ALJ

---

[2] The ALJ determined that McMeekin is independent in personal care, is able to prepare meals, do his laundry and dishes, drive, shop, pay bills and handle a savings account, use a checkbook, and use a cellphone. (R. 19) He also found McMeekin reported no issues with respect to getting along with others and that he visited his mother, friends, brother and nephews. (R. 19)

[3] The ALJ noted that a 2014 neuropsychological examination "showed an adequate grasp of mathematics, a good grasp of all basic operations, some facility with fraction work, reading comprehension that did not exceed the 3.3 grade level and full scale IQ score of 74. (R. 20) However the ALJ also found that the IQ score was at odds with McMeekins' high school GPA of 2.58, indicating average performance. (R. 20)

concluded that McMeekin did not satisfy the "paragraph C" criteria either. That is, McMeekin "does not have a medically documented history of a chronic organic disorder of at least two years of duration with episodes of decompensation or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (R. 20)

At step four, the ALJ determined that McMeekin has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) with certain restrictions.[4] Given these limitations, the ALJ found that McMeekin was unable to perform any of his past relevant work as a construction laborer, which involved tasks considered "heavy." (R. 24) Finally, at step five, the ALJ found that, considering McMeekin's age, education, work experience, and RFC, "there were jobs that existed in significant numbers in the national economy." (R. 24)

### 3. Functional Illiteracy

The Social Security regulations provide that one of the vocational factors an ALJ uses to assess whether a claimant is capable of performing substantial gainful employment is the claimant's educational level. There are four categories used to

---

[4] Those restrictions consist of: only occasional overhead reaching with his left upper extremity; only occasional reaching behind to his back area; and a limitation to work where reading and math are not essential functions of the job. (R. 20)

5

analyze a claimant's educational level: (1) illiterate;[5] (2) marginal education;[6] (3) limited education;[7] and (4) high school education and above.[8] *See* 20 C.F.R. § 416.964.

Here, the ALJ determined that McMeekin had "at least a high school education and is able to communicate in English." (R. 24) Certainly, the record indicates that McMeekin attended school through the 12th grade. (R. 634) However, the numerical grade level a claimant may have completed in school does not necessarily reflect the claimant's actual educational abilities. 20 C.F.R. § 416.964(b) Indeed, "[e]ven an individual with a high school education can be 'illiterate' under the Commissioner's regulations." *Rankin v. Astrue*, Civ. No. 9-180, 2010 WL 3119942 at * 8 (W.D. Pa. Aug. 9, 2010) *citing, Diehl v. Barnhart*, 357 F. Supp.2d 804 (E.D. Pa. 2005). *See also, Batts v. Barnhart*, Civ. No. 1-507, 2002 WL 32345745 at * 7 (E.D. Pa. March 29, 2002) (stating that "the amount of formal schooling is not conclusive as to literacy issues inasmuch as a great number of high school graduates are functional illiterates.") Thus, McMeekin's graduation from high school does not necessarily mean that he has at least a "high school education."

Further, I am confused by the ALJ's decision to give "great weight" to the opinion rendered by Dr. Steven Pacella, a neuropsychologist who evaluated McMeekin on

---

[5] "Illiteracy" means "the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. § 416.964(b)(1).

[6] "Marginal education" means "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education." 20 C.F.R. § 416.964(b)(2).

[7] "Limited education" means "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th through the 11th grade level of formal education is a limited education." 20 C.F.R. § 416.964(b)(3).

[8] A "high school education" means "abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled work." 20 C.F.R. § 416.964(b) ((4).

6

February 12, 2014. (R. 23) Pacella administered a series of tests and determined that McMeekin's Full Scale IQ was 74 – 4th percentile compared to like aged peers. (R. 635) He also declared McMeekin to be "functionally illiterate." (R. 636) Nevertheless, the ALJ rejects these findings, noting that "this IQ score and the finding that he is functionally illiterate are not consistent with the claimant's high school records showing a grade point average of 2.58, indicating an average performance…" (R. 22) The ALJ also emphasizes that "the records do not indicate that he was in special education classes or had an IEP in place." (R. 22) Yet Pacella's opinion indicates that McMeekin had been in "learning support" and that he had "repeated first grade" and experienced "multiple high school failures." (R. 634) McMeekin testified that he was placed in different classes than other students – at least with respect to English and math. (R. 42-43) Further, it is not clear whether the ALJ considered that McMeekin's grade point average may have been obtained through learning support classes.

The ALJ also reasoned that McMeekin's ability to complete training at the Allegheny Fire Academy, his ability to secure a driver's license, and his work over the years in construction, are further at odds with a claim of functional illiteracy. (R. 22) Yet, there is no indication that the ALJ inquired about what training at the Fire Academy consisted of, or why McMeekin remained a volunteer firefighter rather than a paid firefighter. There was an indication in the hearing from McMeekin's counsel that McMeekin retained a "volunteer" status as a firefighter because his inability to read prevented him from becoming a "paid" firefighter. (R. 10)

McMeekin's own testimony during the hearing was consistent with someone who is "functionally illiterate." For instance, when asked whether he could read the

7

headlines of a newspaper, he responded that he could read "some stuff" but added that it is very hard for him to read. (R. 43) He further explained that he cannot take a phone message unless someone spells out words for him. (R. 43) When asked whether he learned to do construction work by looking at pictures and diagrams in guide books, McMeekin responded that he learned how to do things from his father and family who were in construction. (R. 43) He also recounted taking an introduction to computer class at a local library, but stated that he was not successful because he needed someone to help spell when using the computer. (R. 59-60) He did not use a computer to make estimates when performing construction work. (R. 65) The ALJ did not mention any of these facts which would seem to be relevant to the issue of literacy.

The ALJ's failure to acknowledge or discuss these facts is troublesome and requires further analysis and explanation. I do not mean to suggest that the ALJ's finding regarding education will change, but, as stated below, a finding of functional illiteracy could result in an award of benefits. Simply stated, the ALJ needs to provide further analysis as discussed above. Consequently, a remand is required.

4. <u>Consideration of Borderline Age Status</u>

As stated above, an ALJ must consider age in combination with residual functional capacity ("RFC"), education, and work experience when assessing whether a claimant is disabled. 20 C.F.R. § 404.1563(a). Here, the ALJ found that, at 49 years of age as of the date last insured, McMeekin was a "younger individual age 18-49." (R. 24) She also determined that McMeekin "has at least a high school education," and that he was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (R. 25) Consequently, the ALJ denied benefits.

McMeekin contends that, being just six weeks' shy of age 50 on the date last insured, he presented with a "borderline age" situation and that the ALJ erred in mechanically applying the age categories.

The Regulations caution against applying the age categories in a mechanical manner. Section 404.1563(b) provides, in relevant part:

> [w]e will use each of the age categories that applies to you during the period for which we must determine if you are disabled. We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. 1563(b). "There is an assumption inherent in the grids that persons within those categories have certain capabilities, but in a 'borderline situation' this assumption becomes unreliable and a more individualized determination is necessary." *Kane v. Heckler*, 776 F.2d 1130, 1133 (3d Cir. 1985).

Thus, the Commissioner's Hearings, Appeals, and Litigation Law Manual ("HALLEX"), calls for a two-part test to be applied to identify borderline age situations. *Hearings, Appeals and Litigation Law Manual* § II-5-3-2B, Application of the Medical-Vocational Guidelines in Borderline Age Situations, 2003 WL 25498826. First, the ALJ must assess whether the claimant's age is within a few days or a few months of the higher age category. Next, the ALJ must determine whether the higher age category will result in a decision of "disabled" rather than "not disabled." *Id.* "If the answer to one or both is a 'no,' a borderline age situation either does not exist or would not affect the outcome." HALLEX II-5-2-3. In that case, the ALJ will use the claimant's chronological age. If, however, "the answer to both is 'yes,' a borderline age situation exists and the

9

adjudicator must decide whether it is more appropriate to use the higher age or the claimant's chronological age." *Id. See also*, *Tavales v. Colvin*, Civ. No. 16-2000, 2017 WL 1499248 at * 7 (E.D. Pa. Feb. 27, 2017), *quoting*, *Hearings, Appeals and Litigation Law Manual* § II-5-3-2, Application of the Medical-Vocational Guidelines in Borderline Age Situations, 2003 WL 25498826 ("HALLEX II-5-3-2"). (stating, "[t]o determine whether a borderline age situation existed, the ALJ should first have determined whether Plaintiff was within a few days to a few months of a higher age category; if so, using the higher age category, the ALJ should have noted if a determination of disabled rather than not disabled would have resulted.")

Turning to the first inquiry, McMeekin was 49 years old on the date last insured. (R. 24) As such, he was considered a "younger individual." 20 C.F.R. 404.1563(c).[9] However, he turned 50 within 6 weeks of that date. At 50, a claimant is considered to be "closely approaching advanced age." 20 C.F.R. § 404.1563.[10] Although "there is no bright-line rule for what constitutes a 'borderline situation,'" *Davis v. Astrue*, Civ. No. 8-928, 2009 WL 3241853 at * 7 (W.D. Pa. Oct. 5, 2009), case law from this Circuit indicates that six weeks would fall within the borderline situation. *See Davis v. Astrue*, Civ. No. 8-928, 2009 WL 3241853 at * 6-7 (W.D. Pa. Oct. 5, 2009) (holding that a claimant who was within four months of being categorized as a "person of advanced age" at the time of the ALJ's decision presented a borderline age situation), *citing*, *Lucas v. Barnhart*, 184 Fed. Appx. 204 (3d Cir. 2004) (holding that 106 days is

---

[9] The regulations provide that: "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45." 20 C.F.R. 404.1563(c).
[10] The regulations provide that: "[i]f you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work. 20 C.F.R. 404.1563(d).

10

borderline); *Williams v. Bowen*, 1987 WL 9148, * 2 (E.D. Pa. April 6, 1987) (finding seven months to present a borderline age situation) and *Rosado v. Bowen*, 1986 WL 15004, * 4 (E.D. Pa. Dec. 30, 1986) (finding nine months to constitute a borderline age situation). *See also, Vaughn v. Astrue*, 2011 WL 1628031, at * 6 (W.D. Pa. Apr. 28, 2011) (finding four and a half months to be sufficiently close) and *Istik v. Astrue*, 2009 WL 382503, at * 4 (W.D. Pa. Feb. 13, 2009) (concluding that seven months is sufficiently close).

The second inquiry focuses upon whether using the higher age category would result in a decision of "disabled" rather than "not disabled." Here, the ALJ did not engage in a borderline age analysis. Rather, it appears that the ALJ mechanically applied McMeekin's chronological age. In light of the facts presented in this case, I find that the ALJ should have conducted a borderline age analysis. I am not saying that there will be a shift in results. Rather, I am saying that the ALJ should not have applied the age categorization in a mechanical manner. *See Lucas v. Barnhart*, 184 Fed. Appx. 204, 206-08 (3d Cir. 2006).

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY THOMAS MCMEEKIN ) | | |
| Plaintiff, ) | | |
| ) | | |
| -vs- ) | Civil Action No. 16-1831 | |
| ) | | |
| NANCY A. BERRYHILL,[11] ) | | |
| COMMISSIONER OF SOCIAL SECURITY, ) | | |
| ) | | |
| Defendant. ) | | |

AMBROSE, Senior District Judge.

## ORDER OF COURT

Therefore, this 8th day of February, 2018, it is hereby ORDERED that the decision of the ALJ is vacated and this action is remanded for further consideration. It is further ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 11) is GRANTED and Defendant's Motion for Summary Judgment (Docket No. 13) is DENIED.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose
United States Senior District Judge

---

[11] Nancy A. Berryhill became acting Commissioner of Social Security on January 23, 2017, replacing Carolyn W. Colvin.